(23 Misc. Rep. 489.)

DICKINSON v. CONTINENTAL TRUST CO. et al.

(Supreme Court, Special Term, New York County. May, 1898.)

1. BUILDING AND LOAN ASSOCIATIONS—PREFERRED STOCK—ULTRA VIRES.
   Where a building and loan association authorized to do business solely on the mutual plan places securities with a trust company to secure the payment of paid-up nonassessable trustee stock, the holder of which waives any right to additional profits, and is to receive an annual dividend of 6 per cent., though ultra vires as a method of creating preferred memberships, the contract is not unlawful as a method of borrowing money.

2. SAME—AVOIDING CONTRACTS—RESTORATION OF BENEFITS.
   Though a building and loan association authorized to do business solely on the mutual plan cannot issue stock unconditionally guarantying the payment of interest, yet having placed securities with a trust company to secure the payment of paid-up nonassessable "trustee stock," the holder of which waived any right to additional profits, and was to receive an annual dividend of 6 per cent., on its becoming insolvent, its receiver cannot recover the securities on the ground that the issuance of the stock was ultra vires, without tendering back the money paid for the stock.

Suit by Edwin E. Dickinson, receiver of the Granite State Provident Association, against the Continental Trust Company and others. Dismissed.

Lexow, Mackeller & Wells, for plaintiff.

Jay & Chandler, for defendant Continental Trust Co.

John Desmond, for defendant Ashley.

KELLOGG, J. The plaintiff, as receiver of the insolvent corporation above named, and which was created by a special charter from the legislature of the state of New Hampshire to do an insurance and building loan business on the mutual plan, brings this action in equity to compel the surrender to the receiver of certain mortgages held by the Continental Trust Company, and so held as security and for the benefit of the defendants Roscoe B. Ashley and Perry R. Smith. There is no disputed fact in the case. It is conceded that the Granite State Provident Association was empowered by its charter in language following, viz.:

"And shall be capable of acquiring by purchase, lease, mortgage, or otherwise, and of holding absolutely and unconditionally, lands, real estate, and personal property, and of selling, alienating, transferring, mortgaging, leasing, conveying, or in any way disposing of the same, and otherwise acting as a building association, enabling members to purchase or build their own houses."

The charter further provides that the corporation "shall carry on business solely on the mutual plan," and that the holders of "certificates of shares who shall have paid all due premiums or calls thereon ＊ ＊ ＊ shall be respectively members thereof," and further provides for a ratable distribution among its members of all surplus and profits. These provisions of the charter seem to be all that have any bearing on the questions here involved. The charter contemplates a business to be done on the mutual plan; that is, the loans are to be made to members of the association, and the members are to share ratably in the surplus and profits. Any method might have been adopted for the working out of the plan so long as the idea of mutuality was preserved. The full payment of the face value of a certificate when issued is not repugnant to such a plan (Insurance Co. v. Hoge, 21 How. 35); but I think any guaranty of the corporation to pay to any member absolutely a certain annual sum out of the general fund as his dividend or interest upon capital invested in the stock of the association would be repugnant to a "mutual plan," and, unless intended as a loan of money, the payment of such a dividend or interest could not be enforced. An unconditional agreement—one not based on the contingency of surplus or profits—to pay a sum certain at stated periods as dividends upon stock is not compatible with the idea of equality or mutuality. In discussing this question, Earl, J. (People v. Preston, 10 N. Y. 553, 35 N. E. 980), said that the idea of equality and mutuality was not defeated where the certificate provides that "upon prepaid stock there shall be paid, at the time of subscription, dues to the amount of sixty dollars, and the holder thereof shall be entitled to receive, out of the profits apportioned thereto, semiannual

dividends in cash up to the rate of 6 per cent. per annum. The profits apportioned to such stock over and above such dividends shall be credited thereto, and be payable with the stock at its maturity." But it will be observed here that there is no guaranty of 6 or any other per cent. It is wholly limited to the actual profits properly apportioned to this class of stock, and nowhere in his discussion does Judge Earl intimate that business strictly upon the mutual plan would authorize the issuance of stock with an unconditional guaranty of 6 per cent. per annum. The conclusion, it seems to me, is unavoidable, that the charter powers of the Granite State Provident Association were restricted to the issuance of stock, and to the doing of business upon the mutual plan, and that it was not authorized to issue stock, to which was attached an unconditional guaranty of 6 per cent. annually to the holder.

It is undisputed that this association, on May 5, 1894, first issued a certificate known as "fully-paid trustee stock," for $5,000, to Percival Stewart. This certificate was returned May 13, 1895, and Mr. Stewart received the $5,000 and interest. The next certificate was issued also to Mr. Stewart on February 13, 1895, for $10,000, and was returned May 13, 1895, and the money repaid. The next certificates were issued to defendant Ashley, of Rochester, N. Y., on May 24, 1895, aggregating $3,045, and all are still outstanding. The next was to defendant Smith, of Constableville, N. Y., on December 17, 1895, for $500, and is still outstanding. This constitutes all the "business" done by this association in this class of certificates. The order appointing a temporary receiver herein is dated March 28, 1896; and it may easily be assumed that the association was in fact insolvent when these certificates were issued, and the money of these two defendants was paid to it. On November 1, 1894, the association made an agreement with defendant the Continental Trust Company, whereby the trust company was to receive the money which might be paid for stock of this class, and turn it over to the association, on receipt of sufficient mortgages to secure the holder of the stock, and the certificates of stock were to bear upon the back or face the certificate of the trust company that it held such mortgages as security for the certificates so issued, and for performance of the conditions of payment entered into by the association, which contract conditions were also to be expressed upon such certificate. Upon the back of the certificates issued to these defendants, among other things, appears as follows:

"This certificate is fully paid and nonassessable, and the holder shall receive a dividend of six per cent. per annum, payable semiannually on the first days of January and July; and in consideration of the additional security given by placing the money paid upon this certificate, and the securities purchased therewith in the custody of the Continental Trust Company of New York, the holder waives forever any right to additional profits or dividends."

Then come provisions for redemption of the certificate by the association by payment in full, etc., and the holder is given the right to demand payment in full after 10 years. This discloses a special contract, quite outside the ordinary contract between the association and the other members, and has more the appearance of a loan of money upon security than otherwise. It certainly is not capital

taking the risks and chances of the business. The defendants Ashley and Smith parted with their money in good faith, under this contract, and upon these conditions it was paid to the Continental Trust Company. The association received it from the Continental Trust Company, upon turning over the mortgages now sought to be recovered, and the money found its way into the association's general fund for the benefit of all the other members. These defendants were not members of the association before they parted with their money, and did not rely upon any promise of the association to pay either principal or interest. They had the assurance of the Continental Trust Company and the mortgages in the possession of that company as security. Except for this assurance and this security for its return, it is not at all likely the association would have become possessed of the money. All this may have been ultra vires so far as the association was concerned, and I think it was in so far as it can be viewed as a method of creating preferred memberships in the association, but it is not a contract against public policy in the sense that it was malum in se,—contra bonos mores; and, regarded as a method of borrowing money, cannot be considered as malum prohibitum; the charter, at most, only prohibiting the doing "business" on any other than the mutual plan. In this contract the public has no interest. No one could be affected injuriously by it except the other members of the association, and they, in fact, became, as members of the association, the owners of the money paid over by these defendants. The receiver here represents this association, and stands in no better position and can urge no better equities in this action than could the association itself. The receiver, without restoring or offering to restore to these defendants the money obtained from them through this device, now asks a court of equity to take from the defendants these mortgages which represent their money. When did a court of equity knowingly give active assistance to a suitor confessedly pursuing innocent parties for the purpose of robbery? The court has sometimes refused to aid the innocent in the enforcement of tainted contracts, or contracts void from public policy; but it has uniformly refused to assist the wrongdoer, as in the Utica Insurance Cases. The maxim, "Who asks equity should do equity," cannot be ignored by the plaintiff here. The plea of ultra vires is frequently taken on as a shield and a defense, but rarely does a plaintiff assert his unlawful act as a cause of action. I am convinced that the plaintiff is not now in a position to maintain this action, and will not be until he shall have restored, or offered to restore, the money obtained from defendants Ashley and Smith; that the ultra vires complained of gives plaintiff no standing in this court to assail these defendants or the holder of the mortgages. I am also convinced that the ultra vires complained of, on the part of the association, would not avail as a successful defense in an action brought by the defendants Ashley and Smith, at the proper time, to enforce payment of their claims through these mortgages.

It was declared in Bissell v. Railroad Co., 22 N. Y. 258, that corporations, like natural persons, have power and capacity to do wrong,

and may in their contracts and dealings break over the restraints imposed upon them by their charters; but, when they do so, their exemption from liability cannot be claimed on the sole ground that they have no attributes or faculties which render it possible for them to thus act; that they are bound by their acts where a repudiation of such acts would result in manifest wrong to innocent parties. Of course, this refers to contracts which are not in themselves void if made by an individual, and the court says (page 309):

"I have already adverted to the rule that, where the illegality of the contract consists in the violation of some law the prohibitions of which are aimed at one of the parties only, the other party is to be treated as comparatively innocent, and may have relief against the more guilty party, even in an action ex contractu."

In Parish v. Wheeler, 22 N. Y. 507, Comstock, J., uses this language:

"If the purchase of the steamboat involved any breach of the public law, the corporation alone was guilty, because all the restraints of the statute or the common law, affecting the transaction, are imposed upon it alone. There is certainly no moral turpitude if a railroad corporation buys a steamboat or builds a church; nor is there any legal turpitude. It may be an excess of power or a private breach of trust in respect to its stockholders. The latter may complain, or the state may interpose; but corporations themselves, like individuals, in dealing with other parties, must live up to the rules of common honesty."

This was said in reference to a railroad corporation in the exercise of whose powers the public have an interest, and the rule may be applied to private corporations with even more propriety.

There was a contract made in violation of its charter by the Rider Life Raft Company (Raft Co. v. Roach, 97 N. Y. 381), and here Miller, J., uses this language:

"The rule is well settled that the plea of ultra vires should not, as a general rule, prevail, whether interposed for or against a corporation, when it would not advance justice, but, on the contrary, would accomplish a legal wrong."

It was said by Finch, J., in Seymour v. Cemetery Ass'n, 144 N. Y. 341, 39 N. E. 366:

"That kind of plunder which holds on to the property, but pleads the doctrine of ultra vires against the obligation to pay for it, has no recognition or support in the law of this state."

And why should not this association be required to pay back to these defendants their money? These defendants purchased an interest in these mortgages, and now hold them through their trustee, the Continental Trust Company. That was the legal effect of their contract. For these they paid their money. The plaintiff says the association had no power to sell them. Then make restitution; place these defendants where they stood before this insolvent company seduced them through this unlawful device, if it is unlawful. This is only common honesty, and I see no reason why this plaintiff should be held exempt from its exercise.

The complaint should be dismissed, with costs, and judgment is so directed. Judgment accordingly.